2014 OK 13

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Joel Edward SCOTT, III, Respondent.**

SCBD No. 5992.
OBAD No. 1953.

Supreme Court of Oklahoma.

March 4, 2014.

## ORDER APPROVING RESIGNATION

¶ 1 Before this Court is an affidavit filed by Joel Edward Scott, III, pursuant to Rule 8.1, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2011, Ch. 1, App. 1–A, requesting that he be allowed to resign his membership in the Oklahoma Bar Association and relinquish his right to practice law. The Oklahoma Bar Association has filed an Application for Order Approving Resignation Pending Disciplinary Proceedings.

¶ 2 UPON CONSIDERATION OF THE MATTER WE FIND:

1. The Respondent, Joel Edward Scott, III, OBA # 21350, executed his resignation pending disciplinary proceedings on February 13, 2014.

2. The Respondent was admitted to the practice of law on September 26, 2006, and his official and current roster address with the Oklahoma Bar Association is 4301 N.W. 63rd Street, Suite 211, Oklahoma City, OK 73116.

3. The Respondent's resignation is freely and voluntarily tendered; he is not acting under coercion or duress and he is fully aware of the consequences of submitting his resignation.

4. The Respondent acknowledges receipt and service and is aware of an amended complaint filed on October 14, 2013, and currently pending against him, alleging seven (7) counts of professional misconduct and violation of his oath as an attorney. The allegations against the Respondent are set forth in the amended complaint which is attached hereto as "Exhibit A" and made a part hereof.

5. The Respondent acknowledges that the allegations in the amended complaint regarding his conduct, if proven, would violate Rules 1.1, 1.2, 1.3, 1.4, 1.4, 1.14(a)(c)(d) and (e), 1.16(d), 3.2, 5.5, 8.1(b) and 8.4(a), (b), (c) and (d) of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.2011, Ch. 1, App. 3–A, and Rules 1.3 and 5.2 of the RGDP, as well as his oath as an attorney.

6. The Respondent is aware that a disciplinary hearing is scheduled before the Professional Responsibility Tribunal at 9:30 a.m. on Tuesday, February 18, 2014, through Thursday, February 20, 2014, at the Oklahoma Bar Center. The Respondent is aware that the burden of proof rests upon the Oklahoma Bar Association and he has voluntarily waived any and all right to contest the allegations.

7. The Respondent is aware of the following grievances filed with the Office of the General Counsel of the Oklahoma Bar Association and the pending investigations thereof, TO WIT:

a) DC 13–148: Grievance filed by the Office of the General Counsel of the Oklahoma Bar Association, alleging that the Respondent's IOLTA client trust account was overdrawn on September 3 and September 5, 2013.

b) DC 13–149: Grievance filed by Terry Frazier, alleging that the Respondent assisted a client in filing a fraudulent lien in the amount of $31,225.00 on real property owned by the complainant in Cleveland County, Oklahoma, following the tornado on May 20, 2013.

c) DC 13–181: Grievance filed by Kenneth Owens, alleging that the Respondent assisted a client in filing a fraudulent lien in the amount of $59,600.00 on real property owned by the complainant in Oklahoma County, Oklahoma, following the tornado on May 20, 2013.

8. The Respondent acknowledges that the allegations set forth in the above grievances, if proven, would constitution violations of Rules 1.1, 1.2(d), 1.15, 3.1 and 8.4(a), (b), (c) and (d) of the ORPC, and Rule 1.3 of the

RGDP, as well as his oath as an attorney. The Respondent is aware that the burden of proof regarding these allegations rests upon the Oklahoma Bar Association and he waives any and all right to contest the allegations.

9. The Respondent recognizes that the approval or disapproval of his resignation is at the discretion of this Court. He recognizes and agrees he may be reinstated to the practice of law only upon full compliance with the conditions and procedures described by the Rules Governing Disciplinary Proceedings, and he may make no application for reinstatement prior to the expiration of five (5) years from the effective date of this order;

10. The Respondent has familiarized himself with and has agreed to comply with Rule 9.1, RGDP, within twenty (20) days following the date of his resignation.

11. The Respondent is aware the Oklahoma Bar Association has incurred costs in the investigation and prosecution of this matter and will file an application to assess costs against him pursuant to Rule 6.15, RGDP. He agrees he is responsible for reimbursement of those costs.

12. The Oklahoma Bar Association has filed an Application to Assess Costs in this proceeding on February 13, 2014, in the amount of $1,660.72, and is entitled to be reimbursed by the Respondent for those costs.

13. The Respondent acknowledges that the Client Security Fund may receive claims from his former clients as a result of his conduct and he agrees that if the Oklahoma Bar Association approves and pays such claims, he will reimburse the fund the principal amounts and the applicable statutory interest prior to filing any application for reinstatement.

14. The resignation pending disciplinary proceedings executed by the Respondent is in compliance with Rule 8.1, RGDP. The Respondent has surrendered his Oklahoma Bar Association membership card simultaneously with his resignation. The Respondent requests that he be allowed to resign his membership in the Oklahoma Bar Association and to relinquish his right to practice law.

15. The Respondent's resignation should be approved.

¶ 3 **IT IS THEREFORE ORDERED THAT** the application of the Oklahoma Bar Association for an order approving resignation and the resignation pending disciplinary proceedings executed by Joel E. Scott, III, are hereby approved.

¶ 4 **IT IS FURTHER ORDERED THAT** the Respondent's name be stricken from the roll of attorneys, and, because resignation pending disciplinary proceedings is tantamount to disbarment, he may make no application for reinstatement to membership in the Oklahoma Bar Association prior to the lapse of five (5) years from the date of this order.

¶ 5 **IT IS FURTHER ORDERED THAT** repayment to the Client Security Fund for any monies expended because of the Respondent's malfeasance or nonfeasance shall be a condition of reinstatement. The Respondent shall comply with Rule 9.1, RGDP, within twenty (20) days of the date of this order.

¶ 6 **IT IS FURTHER ORDERED THAT** the Respondent pay the costs of the Oklahoma Bar Association incurred in the investigation and prosecution of this matter, in the amount of $1,660.72, within ninety (90) days of the effective date of this order.

¶ 7 **DONE BY ORDER OF THE SUPREME COURT IN CONFERENCE THIS 4th DAY OF March, 2014.**

¶ 8 ALL JUSTICES CONCUR.

### EXHIBIT A

State of Oklahama ex rel. Oklahoma Bar Association, Complainant,

Joel E. Scott, III, Respondent.

Rule 6, RGDP.

SCBD No. 5992.

OBAD No. 1953.

Supreme Court of Oklahoma.

Oct. 14, 2013.

458

## AMENDED COMPLAINT

Complainant, State of Oklahoma ex rel. Oklahoma Bar Association, for its claim against the Respondent, Joel E. Scott, III, alleges and states:

1. Respondent was admitted to practice law in the state of Oklahoma by the Oklahoma Supreme Court on September 26, 2006 and is a member of the Oklahoma Bar Association. The Respondent was licensed to practice law at all times relevant to this Complaint.

2. To the best knowledge, information, and belief of Complainant, Respondent has committed specific acts which constitute professional misconduct in violation of the Oklahoma Rules of Professional Conduct, ("ORPC"), 5 O.S.2008, ch. 1, app. 3–A and are cause for professional discipline as provided for by the Rules Governing Disciplinary Proceedings, ("RGDP"), 5 O.S.2011, ch. 1, app. 1–A. The ORPC and RGDP are the standards of conduct, adopted and enforced by the Supreme Court of the State of Oklahoma, which provide guidelines by which all attorneys are to practice law in Oklahoma.

3. These proceedings are begun pursuant to Rules 6, RGDP.

4. The official Oklahoma Bar Association roster address of the Respondent is: Joel E. Scott, III, OBA # 21350, 4301 N.W. 63rd Street, Suite 211, Oklahoma City, OK 73116.

## COUNT I—GRIEVANCES BY CAROLYN MARTINEZ AND OKLAHOMA PHYSICAL THERAPY

5. On November 2, 2009, Carolyn Martinez ("Martinez") was involved in an automobile accident, wherein she sustained personal injury and property damages. Thereafter, she hired Respondent to represent her via Hyatt Legal Plans, a prepaid legal services plan provided as part of Martinez' employee benefits with Hertz Corporation.

6. On November 17, 2009, Equity Insurance Co. ("Equity") transmitted to Respondent that it was prepared to settle Martinez' property damage claim in the amount of $748.09. Respondent failed to respond.

7. By letter dated November 30, 2009, Equity again advised Respondent it was prepared to settle Martinez' property damage claim in the amount of $748.09.

8. On June 22, 2010, Martinez underwent spinal fusion due to address the injuries she received in the automobile accident. Martinez was thereafter treated by Oklahoma Physical Therapy ("OPT") from September 22, 2010 to November 9, 2010,

9. Martinez attempted to contact Respondent on numerous occasions by telephone and e-mail regarding her surgery and subsequent medical treatments. Respondent, however, failed to communicate with Martinez.

10. Martinez' medical providers also attempted to telephone Respondent on Martinez' behalf, but were also unable to communicate with him.

11. Approximately three months after her surgery, Martinez went to Respondent's office and discovered he had moved without notifying her.

12. Martinez contacted the OBA and obtained Respondent's new office location and went to his new office. When confronted by Martinez, Respondent denied having received any messages from her.

13. On December 2, 2010, OPT asserted a lien with Equity for Martinez' outstanding medical bills in the amount of $2,069.00.

14. Respondent failed to communicate the property damage settlement to Martinez until December 10, 2010. At that time, Respondent advised her she would receive the settlement funds within two weeks after signing the release.

15. On December 10, 2010, Martinez executed the release and Equity issued a check in the amount of $748.09 to Respondent on Martinez' behalf for the property damages that same day. Respondent, however, failed to provide the settlement check or its proceeds to Martinez for property damages.

16. On May 31, 2011, Respondent settled Martinez' personal injury claim with Equity for the policy limit of $25,000.00. Martinez' medical bills far exceeded that amount. Respondent did not consult with his client about

settling her personal injury claim for $25,000.00.

17. That same day, Equity issued a $25,000.00 settlement check for Martinez' personal injuries from Bank of Oklahoma. Said check was made payable to Martinez, her husband, Respondent, OPT and five other medical providers.

18. On June 17, 2011, Equity advised Respondent that the property damage check it had previously issued on December 10, 2010 had expired. Equity then issued a replacement check June 17, 2011 made payable to "Carolyn Martinez and The Scott Law Firm,"

19. Bank records indicate that on July 6, 2011, Respondent took Equity's $25,000.00 settlement check to Bank of Oklahoma where he "flipped" it for a Bank of Oklahoma Official Check at 3:16 p.m. made payable solely to the "Scott Law Firm."

20. That same day, Respondent negotiated the Bank of Oklahoma Official Check and deposited the $25,000.00 into his trust account at Coppermark Bank, Account number 110083102. Said funds should have remained in Respondent's trust account until an agreement was reached between the interested parties to as to the distribution of funds.

21. Respondent did not advise Martinez, her husband, or OPT of his receipt, negotiation, and deposit of the $25,000.00 settlement check.

22. Respondent was not authorized to sign Martinez', her husband's, or OPT's signatures on the back of the $25,000.00 settlement check,

23. American Intraoperative Monitoring ("AIM") was the only medical provider payee listed on the $25,000.00 check who received any portion of the funds from the Martinez settlement.

24. On July 14, 2011, Respondent deposited Equity's reissued property damage settlement check into his trust account. Said check was not signed by Martinez and she did not authorize Respondent to endorse her signature on the check. To date, Martinez has never received any of the property damages settlement funds from Respondent.

25. During Respondent's representation of Martinez, she received continuous collection calls from her medical providers. The medical providers advised Martinez they were unable to reach Respondent to discuss her bills. Although Martinez gave the providers Respondent's telephone number, fax number, and e-mail address, neither the medical providers nor Martinez were able to reach Respondent.

26. On October 18, 2011, as a result of mounting unpaid medical bills, Martinez hired Attorney Jim Lyons to file bankruptcy on her behalf. Martinez' medical bills exceeded $72,000.00.

27. When Respondent learned Martinez filed bankruptcy, he contacted her and invited her to his office. Respondent gave Martinez and her husband, Brian Johnson, a form to sign which declared that neither of them would include Respondent's thirty-five percent (35%) attorney fee in the bankruptcy case.

28. Respondent told Martinez he would not give her any of the personal injury settlement funds unless she and her husband signed the form. Respondent advised Martinez she would receive over $7,000.00 in about a week if she signed the form. Martinez and her husband signed the form.

29. Thereafter, Martinez began calling Respondent regarding the status of her settlement funds. Martinez was unable to speak with Respondent for over a month and even attempted to contact him by going to his office unannounced.

30. When Martinez finally spoke with Respondent, he told her he never planned on giving her any of the settlement funds because her medical bills were too high and the medical providers disputed their portion of the settlement funds.

31. On November 14, 2011, OPT filed a grievance with the OBA regarding Respondent's failure to notify them of his receipt of the Martinez' settlement funds and his refusal to account for and deliver the portion of the settlement funds in which they claimed an interest.

32. On November 15, 2011, during a hearing on Martinez' bankruptcy, OPT raised the issue that it had not received its portion of the Martinez personal injury settlement. At that time, Martinez learned Respondent had settled her personal injury claim approximately six months earlier without her consent.

33. By letter dated December 16, 2011 and mailed to Respondent's official roster address, the OBA provided Respondent with a copy of OPT's grievance, advised it was opening the matter for formal investigation, and requested Respondent respond in writing within twenty (20) days pursuant to Rule 5.2, RGDP.

34. On January 11, 2012, the OBA received Respondent's written response to OPT's grievance. Respondent advised that the $25,000.00 settlement check had been deposited into his firm's trust account and that he had used "due diligence" to locate all lien holders. Respondent stated he had "never been notified" of OPT's lien.

35. Two sentences following Respondent's statement that he had "never been notified" of OPT's lien, Respondent identified OPT as "one of the providers" he was waiting on to agree to accept a proportionate amount of the funds based on the total owed to each of the medical providers.

36. Respondent further stated he had issued checks payable to all of the medical providers, but had not mailed them due to Martinez filing bankruptcy.

37. Based on Respondent's written response to OPT's grievance, the bulk of the $25,000.00 settlement funds should have remained in his trust account since he claimed he had not mailed settlement checks to the medical providers due to Martinez filing bankruptcy.

38. Respondent's bank records, however, reflect that the $25,000.00 settlement funds deposited on July 6, 2011 into his trust account were quickly depleted with only one of the medical providers, AIM, receiving payment of any funds. By July 29, 2011, Respondent's trust account balance was a negative (-)$677.74.

39. On May 15, 2012, the OBA received a written grievance from Martinez regarding Respondent's failure to communicate, failure to deliver settlement funds, and misrepresentations in handling her legal matter.

40. By letter dated June 11, 2012 and mailed to Respondent's official roster address, the OBA provided Respondent with a copy of Martinez' grievance, advised it was opening the matter for formal investigation, and requested Respondent provide a written response within twenty (20) days as set forth in Rule 5.2, RGDP.

41. Respondent failed to respond within twenty (20) days as required.

42. By letter dated July 12, 2012, and sent via regular and certified mail to Respondent's official roster address, the OBA requested Respondent's written response to Martinez' grievance within five (5) days.

43. Respondent wholly failed to respond to the grievance as required.

44. On August 3, 2012, the OBA's certified letter to Respondent dated July 12, 2012 regarding the Martinez grievance was returned by the United States Postal Service ("USPS"). The envelope for the certified mail indicated the USPS provided notice of the certified mail to Respondent on July 13, 2012; July 20, 2012; and July 28, 2012 before it was returned to the OBA as "UNCLAIMED."

45. By certified mail dated August 20, 2012 and mailed to Respondent's roster address, the OBA again attempted to get a response to the Martinez grievance. Said letter requested Respondent respond within five (5) days.

46. Respondent again failed to respond as required.

47. On September 14, 2012, the OBA's certified mail dated August 20, 2012 regarding the Martinez grievance was also returned by the USPS as "UNCLAIMED." The envelope for said mail indicated notice of the certified mail was left at Respondent's roster address on August 21, 2012; August 30, 2012; and September 5, 2012.

48. As a result of Respondent's failure to respond to Martinez' grievance and the mis-

representations set forth in his written response to the OPT's grievance, a subpoena duces tecum was issued commanding Respondent's appearance, sworn testimony, and production of records on January 24, 2013.

49. During the deposition, Respondent produced a written response to the Martinez grievance dated July 25, 2012 which he claimed to have previously mailed to the OBA.

50. When asked to explain why the OBA had never received his alleged written response to the Martinez grievance until Respondent's appearance at his deposition on January 24, 2013, Respondent testified he not only had issues receiving mail at his office, but also experienced issues with outgoing office mail. Respondent testified that he was not surprised the OBA's file did not show receipt of his response to the Martinez complaint.

51. When asked if he had considered opening a post office box instead of having mail delivered to his office, Respondent testified he had done that for a period, but also experienced problems receiving mail at the post office.

52. In addition to allegedly having issues with the USPS, Respondent also testified he had issues with Helen Swope, whom he claimed was his accountant. Respondent claimed he was unable to get his financial records from Swope in order to respond to the grievances (see Count III, Grievance by Eva Welch, *infra*). Respondent also testified Swope was too busy to speak with him and that she had "password locked" him from his account. Respondent admitted, however, that he had never paid Swope for any services.

53. When interviewed by the OBA, Swope advised she had only worked with Respondent on a specific case in 2010 involving one of her personal friends and that she was not Respondent's accountant (See also "Count V," *infra*). Swope stated she was more of a consultant with the use of Quick-Books and that she had provided Respondent with some training in 2011. Swope also stated the last time she had been in Respon-

dent's QuickBooks file was November of 2011 and she denied that she had ever "password locked" him from his account.

54. Swope also denied that Respondent had attempted to communicate with her regarding his finances and only recalled receiving one text message from Respondent regarding a potential job in the past year.

55. With regard to his authorization to endorse the names of the payees on the Martinez $25,000.00 settlement check, Respondent testified at his deposition that a representative of each medical provider endorsed the check.

56. Other than AIM, the remaining medical providers all deny the $25,000.00 check was endorsed by an authorized employee.

57. When asked whether he was authorized to sign Martinez' or her husband's signature, Respondent testified they verbally authorized him to sign their names to the check.

58. Respondent's misconduct violates the mandatory provisions of Rules 1.2, 1.3, 1.4, 1.5, 1.15(a)(d) and (e), 8.1(b), and 8, 4(a)(b) and (c), ORPC, and Rules 1.3 and 5.2, RGDP, and warrants the imposition of professional discipline.

## COUNT II—GRIEVANCES BY ARTHUR GORDON AND ZACH OUBRE

59. Arthur Gordon ("Gordon") owns and operates jewelry stores throughout Oklahoma.

60. In late 2010 or early 2011, Gordon hired Respondent to collect on some of his past due business accounts.

61. On June 7, 2011, Respondent filed a small claims action on Gordon's behalf in Oklahoma County District Court Case No. SC–2011–9608, *House of Norvelle v. Farris,*

62. The case was dismissed on July 1, 2011 due to Respondent's failure to appear. When Gordon asked why the case had been dismissed, Respondent misrepresented that it had been dismissed by mistake. Gordon thereafter discovered on OSCN that the case had been dismissed because Respondent failed to appear.

63. On June 28, 2011, Gordon received two checks from Respondent for monies collected. Said checks were returned for insufficient funds.

64. On April 9, 2012, Gordon requested Respondent provide him with an accounting of all monies collected on his behalf. Gordon specified that Respondent's last accounting had indicated monies Respondent had collected on Gordon's behalf, but still had not been given to Gordon.

65. When Respondent failed to account for the funds he had received on Gordon's behalf, he was subsequently fired. Gordon then retained Attorney Zach Oubre ("Oubre") to pursue the delinquent accounts and to obtain an accounting of funds Respondent had collected and received on Gordon's behalf.

66. From late April through May of 2012, Oubre requested Respondent provide him with Gordon's files and an accounting of all funds collected.

67. On April 20, 2012, Oubre filed a small claims action against Respondent seeking $3,124.89 which Respondent had failed to remit to Gordon and for which he had failed to account.

68. Respondent delayed providing Oubre with Gordon's files and an accounting of funds he had collected on Gordon's behalf. When Respondent finally did provide Oubre with an accounting of Gordon's funds, it was incomplete and inaccurate.

69. For example, Respondent had previously obtained a judgment and sought collection of the judgment by garnishment in Oklahoma County District Court Case No. SC–2011–5548, *House of Norvelle v. Robert Miller*, In his accounting of that case, Respondent claimed he had previously provided two (2) payments of $94.16 to Gordon. Gordon, however, was never given these payments by Respondent.

70. Additionally, Respondent's bank records and records from Robert Miller's employer, the National Heritage Museum, reflect that Respondent received eleven (11) checks totaling $2,437.22 from September 22, 2011 to February 23, 2012 on behalf of Gordon. Respondent, however, failed to remit any of those proceeds to Gordon.

71. On July 13, 2012 and July 17, 2012, the OBA received written grievances from Gordon and Oubre respectively, regarding Respondent's neglect, misrepresentations, failure to promptly account for and remit client funds, and Respondent's breach of his fiduciary duties.

72. By letter dated July 25, 2012 and mailed to Respondent's official roster address, the OBA provided Respondent with copies of the Gordon and Oubre grievances. Said letter advised the matters were being opened for formal investigation and Respondent was required to respond within twenty (20) days as set forth in Rule 5.2 RGDP.

73. Respondent failed to respond to Gordon's and Oubre's grievances within twenty (20) days as required.

74. By certified letter dated August 20, 2012 and mailed to Respondent's official roster address, the OBA requested Respondent's written response to the grievances within five (5) days.

75. Again, Respondent failed to respond to the grievances as required.

76. As a result of his failure to respond to Gordon's and Oubre's grievances, Respondent was deposed on January 24, 2013.

77. During the deposition, Respondent produced a written response dated July 31, 2012 to the Gordon/Oubre grievances which he claimed to have previously mailed to the OBA.

78. When asked to explain why the OBA did not receive his alleged written response to the grievances until Respondent's appearance at his deposition on January 24, 2013, Respondent testified as his alleged problems with the USPS (see "Count I" at paragraphs 49–51, *supra* ).

79. Respondent's misconduct violates the mandatory provisions of Rules 1.1, 1.3, 1.4, 1.5, 1.15(a) and(d), 1.16(d), 8.1(b), and 8.4(a)(b) and (c), ORPC, and Rules 1.3 and 5.2, RGDP and warrants the imposition of discipline.

## COUNT III—GRIEVANCE BY EVA WELCH

80. On October 6, 2011, Eva Welch ("Welch") hired Respondent to represent her in a personal injury matter resulting from an automobile accident.

81. After the initial consultation with Welch wherein she signed a fee agreement, Respondent failed to communicate with his client for approximately five (5) months, despite Welch making repeated telephone calls to Respondent.

82. On or around March 20, 2012, Welch was finally able to speak with Respondent who informed her that AAA Insurance Co. ("AAA") had agreed to settle her claim for $25,000.00. Respondent told Welch she would receive her share of the settlement after the medical providers (e.g. lien holders) received their portion of the funds.

83. On March 21, 2012, Welch signed a release that stated the $25,000.00 settlement check was to be made payable to Welch, Respondent, and four medical providers.

84. On April 27, 2012, AAA issued a Bank of America check in the amount of $25,000.00 payable only to Respondent and Welch. The settlement check was hand-delivered to Respondent at a Barnes & Noble Bookstore in Oklahoma City.

85. Additionally, although the Bank of America settlement check purported to bear Welch's signature, she neither endorsed her name on it nor authorized Respondent to sign her name on the back of the settlement check.

86. On April 27, 2012, Respondent negotiated the Bank of America check and deposited it into his operating account at Bank of the West, account number 025761833. Said funds should have been deposited into Respondent's trust account and remained there until an agreement was reached between the interested parties as to the distribution of funds.

87. On May 22, 2012, Respondent admitted to Welch that he had "jumped the gun" and that the medical providers had not actually agreed to settle. Respondent advised Welch he would have the case closed by the end of the month and distribute her portion of the settlement funds.

88. By June 1, 2012, the Respondent's Bank of the West operating account, number 025761833, only had a balance of $13,417.72.

89. Respondent again ceased communicating with Welch despite her numerous attempts to speak with him.

90. On August 1, 2012, the OBA received a written grievance from Welch regarding Respondent's refusal to communicate with her for over sixty (60) days and his failure to account for and distribute settlement funds to her and the medical providers.

91. By letter dated August 15, 2012 and mailed to Respondent's official roster address, the OBA notified Respondent of Welch's grievance and requested his written response within twenty (20) days as set forth in Rule 5.2 RGDP.

92. Respondent failed to respond to the Welch grievance as required.

93. By certified mail dated September 20, 2012 and addressed to Respondent's official roster address, the OBA requested Respondent's written response to the Welch grievance within five (5) days.

94. Respondent again failed to respond as required.

95. As a result of Respondent's failure to respond, a subpoena duces tecum was served on Respondent commanding his appearance, sworn testimony, and production of records relating to the Welch grievance on January 24, 2013.

96. On January 24, 2013, Respondent testified during his deposition that he had not responded to the Welch grievance due to his alleged issues with the USPS (see paragraphs 50–51, *supra*).

97. Respondent testified that being served with the subpoena prompted his review of the Welch file which led to his discovery that the case had not handled properly by his staff. Respondent testified that due to his staffs mishandling of the file, Welch had not signed a Settlement Schedule and the settlement funds had not been distributed in her case.

98. Respondent produced a Settlement Schedule he claimed he had found in Welch's file and which he admitted should have been reviewed and signed by his client before funds were disbursed.

99. Despite the fact that the Settlement Schedule had not been reviewed nor approved by Welch, Respondent caused to be issued a cashier's check payable to Welch in the amount of $6,343.46 as well as six (6) cashier's checks payable to Welch's medical providers totaling $9,906.54 which he brought to the deposition.

100. Respondent advised the OBA he would send the cashier's checks to the payees after the deposition. Respondent, however, did not give Welch the cashier's check until March 14, 2013 despite her repeated requests that he release her funds and pay the medical providers who were threatening to file suit against her.

101. When asked why Welch's settlement check had been delivered to him at Barnes and Nobles, Respondent testified he believed it was at the suggestion of the AAA employee and that, in any regard, it was done to expedite payment to his client.

102. During his deposition, Respondent also testified that, although the settlement funds were accidentally deposited into his operating account, they had remained in that account until he had the cashier's checks issued to pay Welch and the medical providers.

103. Contrary to Respondent's testimony, as noted in paragraph 88, *supra*, by June 1, 2012, the Respondent's Bank of the West operating account, number 025761833, had dropped to a balance of $13,417.72.

104. Additionally, Respondent's banking records further demonstrate that on January 23, 2013, *the day before his deposition,* Respondent received a wire transfer of $32,250.00 from his father, Joel E. Scott, II and those funds were used to procure cashier's checks payable to Welch and the medical providers later that same day.

105. Respondent's misconduct violates the mandatory provisions of Rules 1.4, 1.5, 1.15(a)(c)(d) and (e), 8.1(b), and 8.4(a)(b) and (c), ORPC, and Rules 1.3 and 5.2, RGDP, and warrants the imposition of discipline.

## COUNT IV: GRIEVANCE BY DR. JOE FALLIN

106. On February 15, 2012, Dr. Joe Fallin ("Fallin") hired Respondent to collect on past due accounts for Family Dental Center, Inc.

107. Pursuant to their contract, Respondent was to remit payments to Fallin on accounts received by the 15th of the following month in which funds were collected.

108. Respondent requested, and Fallin agreed, to advance court costs and process service fees.

109. After Fallin advanced costs to cover several cases, Respondent began collection efforts on Fallin's behalf, including filing small claims actions.

110. Respondent failed to promptly communicate with Fallin regarding the accounts and failed to timely remit payments as had been agreed to pursuant to their contract.

111. Fallin learned Respondent had not paid him on some collections, even though Respondent had received the funds on Fallin's behalf six to seven months previously. When Fallin confronted Respondent with proof that his patients had made the payments several months before, Respondent paid Fallin, but backdated the checks.

112. Fallin also learned Respondent had not filed lawsuits for which Respondent had requested and received advanced payment of costs and filing fees.

113. By letter dated November 20, 2012, Fallin advised Respondent of the numerous attempts he and his staff had made to reach Respondent by telephone. Fallin requested Respondent provide him with documentation of the patients he had sent for collections as well as payment of all monies which were owed to Fallin per their contract. Fallin also requested Respondent account for and refund all advanced filing fees and costs.

114. Respondent did not comply with Fallin's written request.

115. By letter dated November 27, 2012 which was mailed and hand-delivered to Respondent personally, Fallin again advised of the numerous attempts he and his staff had made to get Respondent to communicate which included leaving letters under Respondent's office door, leaving telephone messages, and even mailing letters to him. Fallin further advised Respondent that he needed a status report of all payments received on his accounts, a status report as to all of Fallin's files in litigation, and a refund of all costs Fallin had advanced for cases that had not been filed.

116. Although Respondent provided some information to Fallin, it was incomplete.

117. By letter dated December 11, 2012, Fallin acknowledged receipt of part of the requested account information from Respondent, but advised it was insufficient and failed to account for the advanced costs and all of the monies Respondent had collected on Fallin's behalf.

118. On December 18, 2012, Respondent wrote Fallin a letter wherein he stated he was asserting an attorney lien on Fallin's files and would deliver the files only after his fee was paid. Respondent further advised he would keep monies he received on Fallin's behalf from the Bloeser case and apply it to his outstanding liens on other cases.

119. On December 26, 2012, the OBA received a grievance from Fallin regarding Respondent's failure to properly communicate, failure to provide an accounting of funds received on Fallin's behalf, and Respondent's failure to remit client funds.

120. By letter dated January 10, 2013 and mailed to Respondent's roster address, the OBA advised it was opening Fallin's grievance for formal investigation and Respondent was required to respond within twenty (20) days.

121. Respondent was deposed on January 24, 2013 prior to his response being due in Fallin's grievance. Respondent agreed to discuss the Fallin grievance during his deposition so long as he was allowed to supplement his answers in writing.

122. Respondent testified he had not been able to respond to Fallin because he did not have access to his financial records. Respondent claimed this was due to his bank's failure to respond to his requests and as a result of Swope "password locking" him out of his system.

123. Respondent admitted he was refusing to turn over certain of Fallin's files until Fallin paid him a disputed fee of $2,900.00. Respondent also admitted he was withholding the last check he received in the Bloeser matter until Fallin paid his fee.

124. Respondent's banking records demonstrate Respondent deposited funds he received on Fallin's behalf into his operating account and failed to hold them separate and safekeep them.

125. Respondent's conduct violates the mandatory provisions of Rules 1.4, 1.15(a)(c)(d)(e) and (f), 1.16(d), 8.4(a)(b) and (c), ORPC, and Rule 1.3, RGDP, and warrants the imposition of professional discipline.

### COUNT V: GRIEVANCE BY CRISTY MINNIS

126. In December of 2005, Cristy Minnis (Minnis) was granted a divorce in *Ditworth v. Ditworth*, Oklahoma County District Court Case No. FD–2005–3741. Pursuant to the Decree of Dissolution of Marriage filed on December 5, 2005, Mr. Ditworth was to prepare the parties' federal and state tax returns for the 2002, 2003 and 2004 tax years on or before January 1, 2006.

127. In late 2009, Minnis learned her ex-husband had not filed the tax returns for tax years 2002–2004 as ordered. Per the Internal Revenue Service ("IRS"), it was alleged Minnis owed in excess of $100,000.00 in taxes.

128. On or about January 24, 2010, Minnis hired Respondent to prosecute a contempt citation against her ex-husband. Respondent was paid a retainer of $3,000.00.

129. On or about April 6, 2011, Respondent filed an Application for Contempt Citation—Post Judgment on behalf of Minnis

against her ex-husband in *Ditworth v. Ditworth*.

130. On or about October 5, 2011, Mr. Ditworth pleaded guilty to the contempt citation and was ordered to provide "all necessary documentation to file both state and federal taxes for 2002, 2003, 2004 within 10 days of date of this order." Minnis was to provide completed returns to her ex-husband five (5) days prior to sentencing.

131. On December 7, 2011, a partial hearing was held regarding sentencing and damages. Respondent appeared at the hearing on Minnis' behalf. The district court ordered the 2002 and 2003 federal tax returns to be filed "immediately" and that the 2004 federal return was to be amended, "if possible by the IRS, and filed under the married filing jointly status." The court ordered Minnis to prepare and file the amended return with Mr. Ditworth's signature. The court further held Mr. Ditworth responsible for "any and all liability determined by this court" and awarded Minnis "... any refunds ... as determined by this court, in regard to the 2002, 2003 and 2004 tax years. As delineated by original decree." The court ordered the parties to appear in 90 days to determine damages, "... to include actual costs of CPA, attorney fees, and court costs" incurred by Minnis.

132. On or about January 9, 2012, CPA Helen Swope ("Swope") submitted the 2004 tax return to Respondent but advised him she questioned the accuracy of the profit, losses and deductions Mr. Ditworth had claimed therein. Nonetheless, Respondent had the parties execute the return and submitted it to the IRS listing his name and his law firm's address on the return. As a result, Respondent was the only authorized person to receive information and notice regarding the return from the IRS.

133. On invoices dated January 31, 2012 and April 30, 2012, Respondent provided Minnis an accounting of his time and services. Said accountings failed to include the $3,000.00 Respondent had previously been paid.

134. Said accountings also showed an outstanding balance owed. In an effort to demonstrate good faith, Minnis' mother paid Respondent an additional $500.00, but requested he provide a corrected billing statement reflecting the $3,000.00 he had previously been paid.

135. Respondent, however, ceased communicating with Minnis and her mother and abandoned Minnis' case.

136. From February 9, 2012 through August 27, 2012, Minnis made repeated attempts to communicate with Respondent by telephone and email asking about the status of the 2004 return and her case.

137. During said time period, Respondent also failed to respond to requests for information from Swope as to the status of the tax returns.

138. On March 7, 2012, the sentencing hearing was stricken by the court—to be reset—because Swope was unable to submit a final statement of costs without knowing whether the IRS had assessed penalties or interest. Additionally, Swope was unable to submit her final bill as well as Respondent's total fees and costs to the court.

139. On April 30, 2012, opposing counsel Attorney Robert Haiges wrote Respondent regarding the status of the tax return. Respondent replied to Haiges by email on May 2, 2012 stating he was "... still waiting on te IRS to return the returns. I will let you know." Haiges had no further communication from Respondent regarding the tax returns.

140. On August 27, 2012, Respondent finally responded to an email from Minnis wherein he replied that he was "not choosing to ignore the emails," but had been trying to determine the status of the tax return. Respondent wrote that he had received notice on two returns, but did not believe he or the CPA had received the 2003 return from Mr. Ditworth; and that he "hoped to resolve it all soon." Respondent again ceased communicating with his client.

141. On February 9, 2013, Minnis sent certified mail to Respondent requesting information as to the status of her case and the tax returns as well as an itemized accounting

of his services and the $3,500.00 fee he had been paid.

142. Respondent failed/refused to claim the certified mail from Minnis and it was returned to her as "UNCLAIMED" on or about March 6, 2013 by the USPS.

143. On April 1, 2013, the OBA received a grievance from Minnis against Respondent regarding his neglect and abandonment of her case.

144. By letter dated April 15, 2013 and mailed to Respondent's official roster address, the OBA advised Respondent it was opening Minnis' grievance for formal investigation and that he was required to respond within twenty (20) days.

145. A copy of the OBA's April 15, 2013 letter was also emailed to Respondent's email account on April 16, 2013.

146. Respondent wholly failed to respond to the Minnis grievance as required.

147. By certified letter dated May 10, 2013 and mailed to Respondent's official roster address, the OBA advised he had failed to respond to Minnis' grievance as required and requested he provide his written response or communicate with the OBA within five (5) days.

148. Despite notice from the USPS on May 13, 2013, Respondent failed/refused to claim the OBA's certified letter and it was returned as "UNCLAIMED" on May 31, 2013.

149. On August 26, 2013, the OBA investigator emailed Respondent regarding his failure to respond to its "... email, regular mail and certified mail" regarding three pending grievances and requested his written responses by Thursday, August 29, 2013.

150. On August 27, 2013, Respondent responded to the investigator's email stating, "I'm sorry, but I do not know what you are referring to. I have always been willing to respond to Mrs. Farabow, I just need to know what I am responding to."

151. On August 28, 2013, the OBA investigator replied to Respondent's email and attached a copy of the grievances in DC 13-55 (Minnis), DC 13-61 (Hollingsworth, "Count VI," *infra*), and DC 13-75 (General Counsel's grievance, "Count VII," *infra*). The OBA's investigator requested Respondent provide a written response to the three grievances within ten (10) days and offered, again, to meet with Respondent to discuss the matter.

152. Respondent wholly failed to respond to the Minnis grievance as required.

153. Respondent's conduct violates the mandatory provisions of Rules 1.3, 1.4, 1.15, 1.16(d), 3.2, 8.1(b), 8.4(a) and (d), ORPC, and Rules 1.3 and 5.2, RGDP, and warrants the imposition of professional discipline.

### COUNT VI: GRIEVANCE BY BOBBY HOLLINGSWORTH

154. On or about July 9, 2012, Bobby Hollingsworth (Hollingsworth) hired Respondent to represent him in a paternity/custody dispute against Lynsay Jo Culbert. Hollingsworth paid Respondent a $1,000.00 fee.

155. On July 11, 2012, unbeknownst to Respondent, a petition was filed in *Culbert v. Hollingsworth*, Oklahoma County District Court Case No. FD–2012–2715.

156. On July 12, 2012, Respondent filed an Entry of Appearance and a Petition to Establish Paternity, Custody and Support of Minor Child in *Hollingsworth v. Culbert*, Oklahoma County District Court Case No. FP–2012–1116. Respondent also filed that date Petitioner's Application for Temporary Order in said case.

157. On or about July 25, 2012, Hollingsworth paid Respondent an additional $1,000.00 fee to represent him in another custody dispute, *Hollingsworth v. Hollingsworth*, Oklahoma County District Court Case No. FD–2010–1635.

158. On or about July 31, 2012, Respondent submitted an accounting for each of Hollingsworth's cases. In the *Hollingsworth v. Culbert* matter, Respondent's billing showed a remaining balance of $19.25 left "in trust." On the *Hollingsworth v. Hollingsworth* case, Respondent's billing showed a balance of $766.00 remaining in trust.

159. Respondent's IOLTA trust account records at Coppermark Bank, however, indicate that on July 31, 2012, there was only an ending balance of $211.87 being held in Respondent's trust account.

160. On August 9, 2012, Respondent filed a Motion to Transfer and Consolidate *Culbert v. Hollingsworth,* Oklahoma County District Court Case No. FD–2012–2715, with the *Hollingsworth v. Culbert,* FP–2012–1116. Said motion was granted.

161. On August 9, 2012, Respondent appeared on behalf of Hollingsworth in the FP–2012–1116 case wherein the matter was heard and joint custody was awarded.

162. On August 29, 2012, Respondent filed a Motion to Determine Custody in *Hollingsworth v. Hollingsworth,* Case Number FD–2012–2715.

163. Thereafter, Respondent ceased communicating despite numerous attempts made by Hollingsworth to contact Respondent by telephone and email. Hollingsworth even drove by Respondent's office trying to locate him, but was unsuccessful.

164. Hollingsworth then hired Attorney Jacob Rowe and by letter dated October 25, 2012, Rowe advised Respondent he had been retained to take over Hollingsworth's cases and requested Respondent provide an accounting for each case. Rowe also requested Respondent forward all of Hollingsworth's remaining funds being held in trust and that Respondent sign and return an enclosed copy of an Order Substituting Counsel.

165. Although Respondent eventually signed and returned the Order Substituting Counsel to Rowe, he failed to provide an accounting for Hollingsworth's cases or forward any remaining funds being held in trust.

166. On or about April 15, 2013, Hollingsworth filed a grievance against Respondent with the OBA regarding Respondent's refusal to provide a current accounting of funds received and services rendered in Hollingsworth's cases.

167. By letter dated April 19, 2013 and mailed to Respondent's official roster address, the OBA advised it was opening Hollingsworth's grievance for formal investigation and that Respondent was required to provide a written response within twenty (20) days.

168. Respondent wholly failed to respond to Hollingsworth's grievance as required.

169. By certified mail dated May 10, 2013, and mailed to Respondent's official roster address, the OBA advised Respondent of his failure to respond to Hollingsworth's grievance and requested he do so within five (5) days.

170. Although Respondent was notified on May 15, 2013 by the USPS of the OBA's certified mail, he failed/refused to claim the letter and it was returned as "UNCLAIMED" on May 31, 2013.

171. On August 26, 2013, an OBA investigator emailed Respondent regarding his failure to respond to the OBA's "... email, regular mail and certified mail" regarding three pending grievances and requested his written responses by Thursday, August 29, 2013.

172. On August 27, 2013, Respondent responded to the investigator's email stating, "I'm sorry, but I do not know what you are referring to. I have always been willing to respond to Mrs. Farabow, I just need to know what I am responding to."

173. On August 28, 2013, the OBA investigator replied to Respondent's email and attached a copy of the grievances in DC 13–55 (Minnis, "Count V," *supra),* DC 13–61 (Hollingsworth, "Count VI"), and DC 13–75 (General Counsel's grievance, "Count VII," *infra).* The OBA's investigator requested Respondent provide a written response to the three grievances within ten (10) days and offered, again, to meet with Respondent to discuss the matter.

174. Respondent wholly failed to respond to the Hollingsworth grievance as required.

175. Respondent's conduct violates the mandatory provisions of Rules 1.4, 1.15, 1.16(d), 8.1(b), 8.4(a), ORPC, and Rules 1.3 and 5.2, RGDP, and warrants the imposition of professional discipline.

## COUNT VII: GRIEVANCE BY GENERAL COUNSEL

176. On or about March 23, 2007, Respondent formed a professional corporation, The Scott Law Firm, P.C., in the State of Oklahoma.

177. As a professional corporation owned by Respondent and operated within the State of Oklahoma, Respondent is required to report his income to the state and the IRS. Respondent is also required to remit withholdings on himself and his employees to the State of Oklahoma and the IRS.

178. Oklahoma Tax Commission records indicate Respondent has not filed a personal tax return since tax year 2002 and has "... never registered, or paid withholding taxes on, any type of business with the Oklahoma Tax Commission."

179. On or about June 8, 2009, an Unemployment Compensation Tax Warrant ("tax warrant") was filed by the Oklahoma Employment Security Commission ("OESC") against The Scott Law Firm, P.C., for failing to file unemployment taxes and failing to remit payment for unpaid unemployment taxes for the fourth calendar quarter of 2007 and the third and fourth calendar quarters of 2008.

180. In January of 2010, the OESC filed a tax warrant against Respondent's firm for failing to file unemployment taxes and failing to remit payment for unpaid unemployment taxes for the first and second calendar quarters of 2009.

181. On July 7, 2010, the OESC filed a tax warrant against Respondent's firm for failing to file unemployment taxes and failing to remit payment for unpaid unemployment taxes for the third and fourth calendar quarters of 2009.

182. On January 11, 2011, the OESC issued a tax warrant against Respondent's firm for failing to file unemployment taxes and failing to remit payment for unpaid unemployment taxes for the first, second, and third calendar quarters of 2010.

183. On November 10, 2011, the OESC issued a tax warrant against Respondent's firm for failing to file unemployment taxes and failing to remit payment for unpaid unemployment taxes for the fourth calendar quarter of 2010 and for the first and second calendar quarters of 2011.

184. On September 12, 2012, the OESC issued a tax warrant against Respondent's firm for failing to file unemployment taxes and failing to remit payment for unpaid unemployment taxes from the fourth quarter of 2008 through the first quarter of 2012.

185. On March 13, 2013, the OESC filed a petition against Respondent and his firm in *State of Oklahoma ex rel. Oklahoma Employment Security Commission v. The Scott Law Firm, PC, and Joel E. Scott, III,* Oklahoma County District Court Case No. CV–2013–500.

186. Attached to the March 13, 2013 civil action filed by OESC was a copy of the September 12, 2012 tax warrant issued against Respondent's law firm which is equivalent to a judgment of a court of record pursuant to 40 O.S. 3–504.

187. On April 8, 2013, an Order to Appear and Answer as to Assets was issued in *State of Oklahoma ex rel. Oklahoma Employment Security Commission v. The Scott Law Firm, PC, and Joel E. Scott, III,* Oklahoma County District Court Case No. CV–2013–500.

188. On April 9, 2013 at 3:08 p.m., Victoria Greenhaw, accepted service of the Petition and the Order to Appear and Answer as to Assets as filed in Oklahoma County District Court Case No. CV–2013–500. Greenhaw accepted service at Respondent's law firm's address.

189. On April 26, 2013, Respondent filed a Special Entry of Appearance as attorney for "Petitioner" in CV–2013–500 and requested, on behalf of the "defendant," an additional twenty (20) days in which to respond.

190. On May 1, 2013, the hearing on assets was continued to May 29, 2013 by agreement of the parties.

191. On May 29, 2013, the hearing on assets was stricken by OESC because Respondent agreed to cooperate with an audit of his financial and business records.

192. Respondent was uncooperative during OESC's attempted audit of his records, however, and on September 12, 2013, OESC filed an Application for [an] Order [of] Injunctive Relief and Authority in Support in CV–2013–500.

193. OESC's application for injunctive relief is set for hearing on October 31, 2013.

194. By letter dated April 30, 2013, the OBA notified Respondent it was opening a formal investigation regarding the enclosed petition filed against him and his law firm in Oklahoma County District Court Case No. CV–2013–500 and that he was required to respond in writing within twenty (20) days. The OBA also emailed a copy of its letter and enclosure to Respondent that same day.

195. Respondent wholly failed to respond to the grievance as required.

196. By certified mail dated May 23, 2013 and mailed to Respondent's official roster address, the OBA advised Respondent of his failure to respond to the grievance regarding the OESC matter and that he was required to provide his written response or contact the OBA within five (5) days.

197. On May 24, 2013, the OBA also emailed Respondent a copy of its May 23, 2013 letter requesting a response to the grievance within five (5) days.

198. Respondent wholly failed to respond to the OBA as required.

199. On June 25, 2013, the OBA's certified mail to Respondent was returned as "UNCLAIMED" despite the fact that the USPS left Respondent notice of the certified mail on May 24, 2013,

200. On August 26, 2013, an OBA investigator emailed Respondent regarding his failure to respond to the OBA's "... email, regular mail and certified mail" regarding three pending grievances and requesting his written responses by Thursday, August 29, 2013.

201. On August 27, 2013, Respondent responded to the investigator's email stating, "I'm sorry, but I do not know what you are referring to. I have always been willing to respond to Mrs. Farabow, I just need to know what I am responding to."

202. On August 28, 2013, the OBA investigator replied to Respondent's email and attached a copy of the grievances in DC 13–55 (Minnis, "Count V," supra), DC 13–61 (Hollingsworth, "Count VI", *supra* ), and DC 13–75 (General Counsel's grievance, "Count VII"). The OBA's investigator's email requested Respondent provide a written response to the three grievances within ten (10) days and offered, again, to meet with Respondent to discuss the matter.

203. Respondent wholly failed to respond to the General Counsel's grievance in DC 13–75 as required.

204. Respondent's conduct violates the mandatory provisions of Rules 8.1(b) and 8.4(b)(c), ORPC, and Rules 1.3 and 5.2, RGDP, and warrants the imposition of professional discipline.

WHEREFORE, premises considered, Complainant requests that the Respondent be disciplined as this Court finds equitable and proper, and for such other relief as this Court finds appropriate.

Done at the direction of the Professional Responsibility Commission this the 14th day of October, 2013.

William R. Grimm. Chairman, Professional Responsibility Commission.

AND

Loraine Dillinder Farabow, OBA # 16833, First Assistant General Counsel, Tommy W. Humphries, OBA # 19130 Assistant General Counsel, Oklahoma Bar Association, P.O. Box 53036, Oklahoma City, OK 73152, ATTORNEYS FOR COMPLAINANT.

### CERTIFICATE OF MAILING

The undersigned hereby certifies that on the 14th day of October, 2013, a true and correct copy of the foregoing Amended Complaint was mailed. *certified, return receipt requested, and by the first class mail, postage prepaid via the United States Postal Service,* to: Joel Edward Scott, III, Respondent, 4301 N.W. 63rd Street, Suite 211, Oklahoma City, OK 73116 and by first class mail, postage prepaid to:

William G. LaSorsa, 15 East Fifth Street, Ste. 3800, Tulsa, OK 74103–4309, PRT PRESIDING MASTER

Joe Crosthwait, 1384 S. Douglas Boulevard, Midwest City, Oklahoma 73130, PRT LAWYER MEMBER

Steven W. Beebe, 3105 Springdale Lane, Duncan, OK 73533, PRT NON–LAWYER MEMBER